## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **DAVID SHAUN NEAL,** | |
| **Plaintiff,** | Civ. No. 13-6981 (KM) (MAH) |
| **v.** | |
| **ASTA FUNDING, INC.,** | **OPINION** |
| **Defendant.** | |

| | |
|---|---|
| **ASTA FUNDING, INC.,** | Civ. No. 14-2495 (KM)(MAH) |
| **Petitioner,** | |
| **v.** | |
| **DAVID SHAUN NEAL, ROBERT F. COYNE, ESQ., and NEW WORLD SOLUTIONS, INC.,** | |
| **Respondents.** | |

| | |
|---|---|
| **DAVID SHAUN NEAL,** | Civ. No. 14-3550 (KM) (MAH) |
| **Plaintiff,** | |
| **v.** | |
| **ASTA FUNDING, INC.,** | |
| **Defendant.** | |

|  |  |
|---|---|
| **ROBERT F. COYNE,** | Civ. No. 14-3932 (KM) (MAH) |
| **Plaintiff,** | |
| **v.** | |
| **ASTA FUNDING, INC.,** | |
| **Defendant.** | |

**MCNULTY, U.S.D.J.:**

This case presents interrelated issues surrounding the validity of an arbitration award. David Shaun Neal ("Neal") provided information technology ("IT") services to Asta Funding Inc. ("Asta"), under an agreement between Asta and New World Solutions, Inc. ("NWS") (the "ITS Agreement"). NWS was co-owned by Neal and his business partner, Robert F. Coyne ("Coyne"); the two were NWS's sole officers and directors until Coyne transferred his entire interest to Neal. Asta, claiming breach of the ITS Agreement, terminated it and instituted arbitration proceedings against NWS, Neal, and Coyne, pursuant to the Agreement's arbitration clause. Neal and Coyne resisted arbitration; they could not be bound to arbitrate, they insisted, because they as individuals (as opposed to NWS) were not parties to the ITS Agreement. Neal and Coyne took to the federal courts to fight the arbitration and to assert affirmative claims against Asta. The arbitrator, however, determined that he had jurisdiction over Neal and Coyne, found in favor of Asta on its claims, and awarded Asta over $3 million in damages against NWS, Neal, and Coyne, jointly and severally.

As the dust has settled, there are seven pending actions before me involving Asta, NWS, Neal, and Coyne. I here focus on four, which have been consolidated for pretrial purposes. Those four consolidated actions are (1) Neal's action seeking a declaratory judgment that he is or was not individually bound to arbitrate (Civ. No. 13-6981 ("Declaratory Judgment Action")), (2)

Asta's petition to confirm the arbitration award (Civ. No. 14-2495 ("Confirmation Action")), (3) Neal's petition to vacate the arbitration award (Civ. No. 14-3550 ("Neal's Action to Vacate")), and (4) Coyne's petition to vacate the arbitration award (Civ. No. 14-3932 ("Coyne's Action to Vacate")).

Now before the Court are the following motions:

(1) Declaratory Judgment Action

    a. Neal's motion for summary judgment (Dkt. No. 85)

    b. Asta's motion to dismiss the complaint for failure to provide discovery pursuant to Fed. R. Civ. P. 37 (Dkt. No. 94)

    c. Neal's appeal of Magistrate Judge Michael Hammer's order denying in part the motion to quash subpoenas served on First Republic Bank and Bank of America (Dkt. No. 104)

    d. Asta's motion for summary judgment (Dkt. No. 117)

    e. Neal's motion to strike Asta's exhibits and certifications filed in support of its motion for summary judgment (Dkt. No. 154)

    f. Coyne's cross-motion for summary judgment, joined by Neal (Dkt. No. 158)

(2) Confirmation Action

    a. Asta's motion to confirm the arbitration award (Dkt. No. 3)

    b. Neal and Coyne's motions to dismiss (Dkt. Nos. 7, 9)

(3) Neal's Action to Vacate

    a. Asta's motion to dismiss (Dkt. No. 7)

(4) Coyne's Action to Vacate

    a. Asta's motion to dismiss or to consolidate the action with the above actions (Dkt. No. 22)

For the reasons set forth below, the arbitration award is confirmed against NWS, Neal and Coyne. Summary judgment is granted in favor of Asta, and denied to Neal and Coyne. Neal and Coyne's petitions to vacate the arbitration award are dismissed. The remaining motions are denied as moot.

## I.    THE ARBITRATION

### A.   The Parties

In 2004, Neal applied for an information technology service position with Asta, a financial firm incorporated in Delaware with its principal place of business in New Jersey. (Statement of Material Facts Not In Dispute In Support Of The Motion of Asta Funding, Inc. For Summary Judgment, dated July 10, 2015, (Dkt. No. 136) ("Asta SOF") ¶¶ 14, 35) Neal was hired, not as an employee, but as an independent contractor through a separate entity, Bach Consulting, which was owned by Coyne. (*Id.* ¶¶ 36, 37) This engagement lasted until 2007, when Coyne sought to discontinue the operations of Bach Consulting. (*Id.* ¶ 39) In its place, Coyne and Neal would establish New World Solutions, Inc. (*Id.* ¶ 40)

New World Solutions, Inc. was incorporated in Delaware on March 26, 2007 ("NWS-DE"). (Asta SOF ¶ 20) Neal and Coyne were the sole owners, officers and directors of NWS-DE, each owning fifty percent. (*Id.* ¶ 21) Neal continued to perform IT services for Asta, while Coyne, on behalf of NWS-DE, negotiated the terms pursuant to which NWS-DE (through Neal) would provide such services. (*Id.* ¶¶ 41, 44) On July 1, 2009, Coyne, on behalf of NWS-DE, entered into the contract with Asta (the "ITS Agreement"). (*Id.* ¶ 48)

For reasons unknown (and without informing Asta), Coyne dissolved NWS-DE and formed a new NWS entity. (Asta SOF ¶¶ 22–25) New World Solutions, Inc., was incorporated in Wyoming on May 25, 2010 ("NWS-WY"); NWS-DE was dissolved on July 12, 2010. (*Id.*) As before, Neal and Coyne were 50/50 owners and the sole officers and directors of the NWS-WY entity. (*Id.* ¶ 31) Two years later, on July 10, 2012, again for undisclosed reasons and without notice to Asta, NWS-WY was administratively dissolved by the Wyoming Office of the Secretary of State. (*Id.* ¶ 29) NWS-WY was reinstated on July 26, 2012. (*Id.* ¶ 30) On December 6, 2012, Coyne assigned his interest in NWS-WY to Neal, making Neal the sole owner of the entity. (*Id.* ¶ 132) NWS-WY was again administratively dissolved on July 10, 2013, for failure to file certain reports and pay license taxes. (*Id.* ¶¶ 32, 137) Neal attempted to reinstate

NWS-WY in November 2013, but that application was rejected by the Wyoming Secretary of State. Neal made no further efforts to revive the company. (*Id.* ¶¶ 139, 140)

### B. The ITS Agreement

As noted, Asta and NWS-DE entered into the ITS Agreement on July 1, 2009. The agreement contemplated that NWS, "acting through its personnel," would provide certain IT-related services called "Basic Services." (Certification Of Counsel In Support Of The Motion Of Asta Funding, Inc. For Summary Judgment, dated July 10, 2015, ("Asta Ex.") Ex. 1 § 3) These "Basic Services" included IT and computing services that "are reasonably necessary for Asta to conduct its operations in the ordinary course of business." (*Id.* p. 13, Ex. A to ITS Agreement) The Agreement provided that the provision of Basic Services was to be "consistent with past services provided by NWS to Asta." (*Id.*) Thus, the contract memorialized, and was a necessary step to ensure, Neal's uninterrupted provision of IT services. (Asta SOF ¶¶ 60–62)

The ITS Agreement provided that, for its three year term, NWS would be the "exclusive provider" of the Basic Services. (Ex. 1 § 3.1) Both Asta and NWS were to designate an "IT Services Manager" to serve as a point of contact. (*Id.* § 6.1) Neal was designated to fill that role for NWS. (Asta SOF ¶ 52)

On June 27, 2012, Asta terminated the ITS Agreement, claiming that NWS had breached material terms of the contract. (Asta SOF ¶ 74) According to Asta, as of the date of termination, it had paid NWS over $4 million. (*Id.* ¶ 75)

### C. The Arbitration

On July 26, 2012, Asta initiated arbitration against NWS pursuant to the arbitration clause in the ITS Agreement. That clause provided:

> In the event that a dispute, controversy, or claim between the Parties arising directly or indirectly out of or in connection with this Agreement cannot be resolved by the IT Services Managers, either Party may elect to have such dispute, controversy, or claim resolved by arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association ("AAA").

(Asta Ex. 1 § 6.2) Asta asserted claims against NWS for breach of contract and unjust enrichment, alleging that NWS failed to meet the requirements of the ITS Agreement. (Asta Ex. 8) Specifically, Asta claimed that (1) NWS failed to properly advise and support Asta's automated dialer system and negligently created a malfunctioning replacement system, (2) NWS entered into a third-party contract to retain workers in the Philippines without Asta's consent and submitted inflated bills to Asta for those workers, (3) NWS retained a third-party, Sun Interactive Services, Inc. ("SISI"), to provide IT-system monitoring but despite large payments by Asta, SISI performed negligible services, (4) NWS failed to cooperate with Asta in tracking IT requests or in providing information on system functioning, and (5) NWS failed to properly provide transition services at the time the contract was terminated.

NWS was represented by the law firm of McLaughlin & Nardi, LLC until October 18, 2012, when Coyne took over the representation. (Asta SOF ¶ 77) On November 8, 2012, NWS filed a Counterclaim in arbitration against Asta for breach of the ITS Agreement. (*Id.* ¶ 79; Asta Ex. 10) The Counterclaim asserted that Asta failed to remit amounts due to NWS, obtained services from third-party providers in violation of the "exclusive provider" clause of the ITS Agreement, and failed to provide sufficient notice of termination.

On August 7, 2013, Asta filed a Supplemental Statement of Claim adding claims under the New Jersey Consumer Fraud Act, the Computer Fraud and Abuse Act, New Jersey Computer Related Offenses Act, trespass, and conversion. These were based on, *inter alia,* NWS's alleged failure to abide by the confidentiality terms in the ITS Agreement and an order regarding confidentiality entered in the arbitration proceedings. (Asta Ex. 14) Specifically, Asta alleged that NWS and Neal had accessed certain confidential information contained on Asta computers without authorization and had forwarded those documents to Neal's personal email account, and that Neal had improperly wiped all electronic data and documents from an Asta-owned computer. Asta also alleged that Neal had used documents produced in the arbitration, which were subject to a confidentiality order issued by the arbitrator, in filing federal

litigation. On September 3, 2013, Asta initiated a second arbitration before the AAA, this one against Neal and Coyne personally, and based on the same claims Asta had asserted against NWS in the Supplemental Statement of Claim. (Asta Ex. 15)

On October 16, 2013, the Arbitrator, Robert E. Bartkus, issued a preliminary determination that Neal and Coyne were bound by the arbitration clause and consolidated the two arbitrations. (Asta Ex. 29)

### D.    Discovery

#### 1. Confidentiality Concerns

As the parties began discovery, they entered into a Stipulated Discovery Confidentiality Order on January 31, 2013, which was so ordered by the Arbitrator on February 14, 2013 ("Confidentiality Order"). (Asta Ex. 11) The Confidentiality Order provided that any information disclosed during the course of discovery in the arbitration which had been designated by a party as confidential would be used "solely for the purpose of preparing for and conducting the above-captioned arbitration" and that the contents of that confidential information could not "be disclosed to anyone nor used for any other purpose." (*Id.* ¶ 9)

With that order in place, Asta produced certain documents it designated as confidential. Neal, according to Asta, used those and other Asta documents in support of his federal litigation alleging unlawful retaliation for whistleblowing activities, Civ. No. 2:13-03438 ("Whistleblower II"),[1] in violation of the Confidentiality Order and the confidentiality provisions in the ITS Agreement. Asta also determined, through the documents Neal had produced in the arbitration, that, during his time as IT manager, Neal had been accessing document files on Asta computers without proper authorization and

---

[1]    *See* Section II.A, *infra*. The first whistleblower action, Civ. No. 2:12-5307, was brought by Neal naming himself and NWS as plaintiffs. Neal and NWS voluntarily dismissed that action on October 16, 2012. (Dkt. No. 19) The actions are similar except that in Whistleblower II, NWS is not a party and additional individual Asta employees are named as defendants.

forwarding them to his personal email account and home computer, and had improperly retained those documents after the termination of the ITS Agreement. (Asta SOF ¶¶ 92–94) Asta sought an order requiring Neal and NWS to return to Asta those documents and a protective order to stem further public dissemination of confidential documents.

The Arbitrator issued an order dated June 26, 2013, enjoining NWS and Neal from disclosing information designated as confidential. (Asta Ex. 12) That order also mandated the return of certain documents to Asta. NWS and Neal failed to abide by the order, necessitating an additional order, this one dated August 6, 2013, ordering the same relief. (Asta Ex. 13) Again, NWS and Neal failed to comply. The Arbitrator issued a third order on January 12, 2014, which enjoined the parties from disclosing information provided in the arbitration. (Asta Ex. 48)

## 2. SISI Fraud

In April of 2009, Neal recommended that Asta retain SISI to provide monitoring services. (Asta SOF ¶ 141) Neal had apparently negotiated favorable pricing with SISI for a software license and support services from Oracle, Inc. (*Id.* ¶ 144) Asta claims that it paid over $117,000 for the Oracle license in addition to paying SISI over $433,000 for computer-network monitoring services between May 2009 and June 2012. (*Id.* ¶¶ 145, 146)

Discovery, according to Asta, revealed certain suspect information about SISI. First, SISI was formed in Wyoming, using the same service that Coyne had used to set up NWS-WY. (Asta SOF ¶ 148) Asta also uncovered that SISI had been dissolved on November 26, 2012, only four months after Asta terminated the ITS Agreement. (*Id.* ¶ 149) Asta learned that SISI's accounts at Bank of America were controlled by Coyne. (*Id.* ¶¶ 152, 153) The bank account records allegedly show that Coyne has transferred money from SISI to NWS and also applied SISI money for his personal use. (*Id.* ¶ 155) Asta contends that it was never told that Coyne controlled SISI. At his deposition, Neal disclaimed knowledge that SISI was controlled by Coyne, and said he could not

recall whom at SISI he contacted to negotiate the Oracle license. (Asta SOF ¶¶163–64) Asta hired a computer forensic expert who opined that the computer monitoring services provided by SISI were, in fact, "negligible." (*Id.* ¶ 171) Oracle's licensing expert was unable to find any record of a license purchased on behalf of Asta by or through SISI. (*Id.* ¶ 172)

### E. Arbitration Hearing

On December 13, 2013, the Arbitrator issued an order directing the submission of pre-hearing statements and noting that "NWS, Neal and Coyne shall be entitled to appear and cross-examine any witnesses presented by ASTA and to submit proof…in opposition" to any evidence submitted by Asta. (Asta Ex. 30) Asta, NWS, and Neal submitted pre-hearing statements, but Coyne did not. Neal sought twice to stay the arbitration on an emergent basis, but I denied his applications. (*See* Sections II.A & B, *infra.*)

An arbitration hearing was held on January 7, 10, 16, 20, 21, and 24, 2014. Neal appeared on behalf of NWS and in his individual capacity for the first day of the hearing only. At the hearing and in an order issued at the conclusion of the first session, the Arbitrator stated that Neal's participation would not be construed as a waiver of his objections to jurisdiction. (Asta Ex. 35 Tr. 25:15-26:4; Ex. 37 (January 7, 2014 Order)) Coyne failed to appear and failed to comply with a subpoena to appear at the hearing. (Asta SOF ¶¶ 188, 189)

### F. The Arbitration Awards

### 1. Jurisdiction Award

On March 5, 2014, the Arbitrator, Robert E. Bartkus, issued a Partial Final Award (Jurisdiction) (the "Jurisdiction Award")[2]. (Asta Ex. 50) The Arbitrator first addressed "whether I have jurisdiction to determine whether there is an agreement permitting me to hear and decide claims that may be

---

[2]    That final award was preceded by a preliminary finding on October 16, 2013, that Neal was subject to the arbitration clause but setting a hearing and additional briefing on the issue. (Asta Ex. 29)

made against the Respondents." (*Id.* p. 2) The Arbitrator looked to Section 6.2 of the ITS Agreement, which provides for arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association of disputes, controversies or claims between the Parties (defined by the introductory paragraph as NWS and Asta) arising out of the ITS Agreement. (*Id.*) Because Section R-7(a) of the AAA Rules provides that an arbitrator shall have the power to determine his own jurisdiction and the scope of the arbitration agreement, the parties' election of the AAA Rules in the ITS Agreement amounted to an election to have the arbitrator determine his own jurisdiction, pursuant to *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 115 S. Ct. 1920 (1995). (*Id.* p. 3–4) The Arbitrator found that the determination of whether the individual Respondents could be bound by the arbitration clause was within the authority granted by Rule R-7(a) and required an interpretation of the term "Parties" in accordance with standard contract and agency law principles. (*Id.* p. 5)

Although NWS was a signatory to the ITS Agreement and had not objected to jurisdiction, the Arbitrator did delve into whether NWS was bound to arbitrate, because of questions that arose in the course of discovery concerning NWS's identity. As explained above, it became clear that the original NWS was a Delaware entity formed in March 2007 but, unbeknownst to Asta, dissolved in July 2010, during the term of the ITS Agreement. It was also discovered that a second NWS was formed in Wyoming in May 2010. The Arbitrator determined that there was no evidence that the ITS Agreement had been assigned from NWS-DE to NWS-WY or that there was a merger between the two. There was evidence presented, however, that Neal and Coyne were aware of the dissolution of NWS-DE and the formation of NWS-WY and that both were the co-owners of each entity. Both individuals held out "NWS" as the party to the ITS Agreement and filed a Counterclaim on behalf of "NWS." Accordingly, the Arbitrator determined that NWS-DE and NWS-WY were parties to the ITS Agreement for purposes of being parties to the arbitration. (*Id.* p. 10)

The Arbitrator next turned to whether there was jurisdiction to bind Neal to arbitrate. The Arbitrator noted that Neal personally applied for a job as Asta's IT director but was required to use a consulting company as a vehicle to be hired for the role. Neal was originally hired through Bach Consulting, a company owned by Coyne, and after that was dissolved, NWS was created to take its place. Neal was a co-owner of NWS with Coyne, and Neal received most of his six-figure annual income from NWS. While NWS may have had other clients, the "overwhelming work and income was from Asta." (*Id.* p. 11) The Arbitrator also described how Neal recommended to Asta that it replace its server-monitoring service company with Sun Interactive Services, Inc. ("SISI"), an entity owned by Coyne and which the evidence demonstrated actually provided negligible services in return for upwards of $10,000 per month. (*Id.* p. 12) The evidence examined by the Arbitrator demonstrated that NWS and Neal breached confidentiality obligations and provided "woefully deficient" services to Asta. (*Id.* p. 13) Finally, the Arbitrator found that Neal had "outright lie[d]" regarding the Oracle software and license, that Neal was not credible, and that the money Asta paid for the Oracle license went to Neal and Coyne personally. (*Id.*) The Arbitrator determined that "Mr. Neal and Mr. Coyne used NWS, both before and after execution of the 2009 Services Agreement, to defraud Asta of hundreds of thousands if not millions of dollars." (*Id.*)

After reviewing the evidence, the Arbitrator looked to New Jersey state contract and agency law principles to determine whether Neal could be required to arbitrate as a non-signatory. The Arbitrator found that traditional agency principles did not apply because the cases which used agency to compel arbitration were those in which it was the non-signatory who was seeking to compel a signatory to arbitrate, rather than the posture of this case in which a non-signatory sought to avoid arbitration. (*Id.* p. 17) The Arbitrator did, however, find that Neal was bound to arbitrate under the theories of veil-piercing/alter-ego and equitable estoppel.

As to veil piercing, the Arbitrator found that Neal and Coyne's deposition testimony regarding the corporate structure of NWS was not credible (*Id.* p. 17) The changes to NWS's structure, the Arbitrator found, were not done for legitimate purposes, but instead were "a façade for the illicit operations of the two shareholders, including Mr. Neal, and their efforts to extract money from Asta." (*Id.* p. 18) The Arbitrator noted that NWS failed to produce any of the corporate documentation that would be expected of a functioning entity and that only select tax returns had been produced. Those that were produced evidenced that NWS was a "pass-through" for proceeds from Asta to be funneled to Neal and Coyne. (*Id.*) The Arbitrator was also concerned by the sequence of events in which Neal pursued a counterclaim on behalf of NWS, but after NWS-DE was dissolved and only a month before Coyne assigned his interests in NWS-WY to Neal. Neal, the Arbitrator found, first participated in the arbitration, only withdrawing after the NWS-WY entity was dissolved. (*Id.*)

As to equitable estoppel, the Arbitrator found as follows. Neal was aware of the arbitration clause in the ITS Agreement, filed the Counterclaim in the arbitration on behalf of NWS, and became the sole beneficiary of that claim. He thus was "expected to reap the benefits" of the arbitration. (*Id.* p. 21) The Arbitrator found that Neal "knowingly exploited" the ITS Agreement by filing the Counterclaim and federal actions based on identical claims, and thus should be estopped from disavowing the arbitration clause. (*Id.*) Furthermore, the Arbitrator determined that Neal was a direct beneficiary of the contractual relationship between Asta and NWS because his continued employment as an IT manager for Asta was the reason for the entities' having entered into the ITS Agreement. (*Id.* p. 23)

Coyne, too, was found to be bound to the arbitration clause under the theory of veil piercing/alter ego. (*Id.* pp. 26–27) Coyne's factual situation, however, differed from that of Neal. The Arbitrator reasoned that, although Coyne signed the ITS Agreement on behalf of NWS and was a co-owner of NWS until December 2012, Coyne did not provide IT services for Asta and he no

longer had a personal stake in the arbitration as of December 2012. Coyne did, however, benefit from the payments Asta made to both NWS and SISI, and Coyne was responsible for the corporate structure changes of the NWS entities. The Arbitrator thus found that it was appropriate to pierce the corporate veil as to Coyne and found that he was bound to arbitrate. (*Id.* p. 27)

### 2.    Summary and Final Award

On April 2, 2014, the Arbitrator issued a Non-Confidential Summary Arbitration Award ("Summary Award") and a Confidential Final Award (Liability and Damages) (the "Final Award"). (Asta Exs. 51, 52) The Arbitrator determined that "NWS committed multiple material breaches" of the ITS Agreement; these involved, *inter alia,* the confidentiality clauses and the replacement dialer. (Asta Ex. 52 p. 1) The Arbitrator also found that the corporate veils of NWS-DE and NWS-WY should be pierced because they were alter egos for Neal and Coyne, and that Neal and Coyne "committed common law and consumer fraud" and violated the Federal Computer Fraud and Abuse Act ("CFA") and the New Jersey Computer Related Offenses Act ("NJCROA"). (*Id.* pp. 1–2)

The Arbitrator awarded Asta damages in excess of $3 million against NWS, Neal and Coyne, jointly and severally. Specifically, on the breach of contract claims, Asta was awarded $73,000 for the amount paid for the non-functioning replacement dialer and $657,974.89 to remediate the other contract breaches. (*Id.* ¶¶ 3–4) On the fraud claims, Asta was awarded $553,997.50 for the common law fraud claim, an amount which was trebled pursuant to the CFA for an award of $1,661,992.50. (*Id.* ¶¶ 5–6) Asta was also awarded punitive damages of twice the amount of the common law fraud claim, but this award was in the alternative to the trebled damages. (*Id.* ¶ 7) Pursuant to the CFA and NJCROA, the Arbitrator awarded Asta $130,485 for investigative and remediation costs expended as a result of the confidentiality breaches; punitive damages in the amount of $100,000; and attorneys' fees and costs in the amount of $552,897. (*Id.* ¶¶ 8–10) Asta was awarded $25,370.60 in costs and an indeterminate amount of attorneys' fees in seeking

to enforce the arbitration hearing orders and to confirm the award. (*Id.* ¶¶ 11–12)

The total award of damages against all Respondents was $2,971,234.99, with an additional award of $230,485 against NWS and Neal only. (*Id.* ¶ 15) The Arbitrator also awarded AAA administrative fees and the Arbitrator's fees and expenses against all Respondents in the amount of $42,140.84. (*Id.* ¶ 16) Finally, Respondents were ordered to return all Asta property, including documents or data, within seven days of the award. (*Id.* ¶ 14)

## II.      FEDERAL COURT ACTIONS

A number of actions have been filed in this Court relating to the arbitration between Asta and NWS, Neal, and Coyne.

### A. Whistleblower Action

The issue of the Arbitrator's jurisdiction first came before this Court in the ancillary context of a whistleblower action brought by Neal against Asta.

On June 3, 2013, Neal filed a complaint against Asta and a number of Asta employees in this Court alleging that he was improperly retaliated against for whistleblowing activity. (Civ. No. 13-3438, Dkt. No. 1) Specifically, Neal alleges that he complained to his supervisors regarding various deficiencies in Asta's records (including, *inter alia*, incorrect post-judgment interest calculations and retention of payments that were improperly collected) and certain activity that Neal considered to be unethical. Neal contends Asta's termination of his employment and institution of arbitration proceedings was retaliatory.

Asta moved to dismiss the action for lack of jurisdiction and failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6). (Dkt. No. 25) Asta took the position that any such claims should be pursued in the then-pending arbitration. Neal then moved to stay the arbitration and sought sanctions against Asta's counsel. (Dkt. No. 28)

On December 4, 2013, I denied the motion to stay the arbitration:

ASTA initiated arbitration on July 26, 2012, well over a year ago. (Docket No. 25-1 at 26). NWS and ASTA remain embroiled in the

ongoing arbitration. The Arbitrator has now determined that Neal is individually subject to the arbitration agreement, and has consolidated ASTA's claims against Neal with the other claims. Consolidation Order. Neal acknowledges that, as of July 26, 2013, "tens of thousands of pages of discovery ha[d] been exchanged by the parties as well as several hundred thousand emails and four depositions have occurred." Docket No. 11-1 at 4. Neal has fully participated in the arbitrations as NWS's representative. *See, e.g.*, Docket No 42-1 (Exhibit 8) ("Respondent's Motion for Omnibus Relief"). [A footnote cites Neal's signing of a motion in the arbitration for omnibus relief as "Managing Partner, New World Solutions, for the Respondent-Counterclaimant, New World Solutions, Inc."]

(Dkt. No. 45)

The Court stayed the Whistleblower Action pending a determination in the arbitration. (Dkt. No. 45) On March 18, 2014, Neal moved to vacate the stay. (Dkt. No. 50) Asta opposed that motion, which is pending. (Dkt. No. 53)[3]

## B. Neal's Declaratory Judgment Action

---

[3]    Two months after filing the Whistleblower Action, on August 9, 2013, Neal filed a complaint against Asta and certain employees, alleging that, by filing certain briefs in the Whistleblower Action, Asta had violated the Confidentiality Order entered into during the arbitration proceeding and had published false and defamatory statements about Neal. (Civ. No. 13-4814) Asta moved to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim. (Dkt. No. 11) The parties also cross-moved for sanctions. (Dkt. Nos. 19, 20) By Order dated June 9, 2014, this Court administratively terminated the motions and stayed the action pending the outcome in the Declaratory Judgment Actions, the Confirmation Action and the petitions to vacate the arbitration award. (Dkt. No. 23)

In addition, the Court is aware of the following: (1) a whistleblower complaint with the Department of Labor (No. 2-1750-13-002); (2) a Fair Debt Collection Practices Action in the Southern District of New York that was dismissed (*Vivaudou et al v. ASTA Funding, Inc.*, 12-cv-9089); (3) a defamation action in the Southern District of New York (*Neal v. ASTA Funding Inc., et al.*, No. 7:13-cv-2176); (4) a fraud and criminal coercion action before the Supreme Court of New York, Orange County (*Neal v. American Arbitration Association et al.*, No. 2013-cv-7991).

Meanwhile, on November 18, 2013, Neal filed another complaint in this Court (Civ. No. 13-6981) seeking, *inter alia,* a declaratory judgment that he could not be compelled to arbitrate. Neal also seeks a declaratory judgment that any claims relating to SISI cannot be submitted to arbitration.

On December 16, 2013, twelve days after my denial of his prior motion to stay the arbitration (*see* Section II.A, *supra*), Neal filed an emergent application to stay the arbitration hearing, which was scheduled for January 7, 2014. (Dkt. No. 5) On December 20, 2013, I issued an order to show cause, setting the motion for a hearing on January 6, 2013, but declining to stay the arbitration in the interim. (Dkt. No. 11) Following oral argument on January 6, 2014, I denied the application to enjoin the arbitration hearing, finding that Neal had not made a sufficient showing to justify emergent relief. I did, however, note that legal and factual issues might be presented, and order additional briefing. (Dkt. No. 19) (directing the parties to *Bel-Ray Co. v. Cherite (Pty) Ltd.,* 181 F.3d 435 (3d Cir. 1999)). I set a hearing date, and a hearing was held on March 7, 2014. (Dkt. No. 43) In the interim, I directed the parties to file submissions with Magistrate Judge Michael Hammer regarding the discovery sought in connection with the issue of whether Neal could be compelled to arbitrate. (Dkt. No. 44)

### C.    Coyne's Declaratory Judgment Action

On December 20, 2013, Coyne filed a complaint against Asta in the United States District Court for the Central District of California (Civ. No. 13-9372) seeking a declaratory judgment that Coyne was not a party to the ITS Agreement and may not be forced to arbitrate the claims asserted by Asta against him or SISI. (Dkt. No. 2) Asta filed a motion to transfer the action to this Court, which was granted on April 15, 2014, and assigned Civ. No. 14-2475. (Dkt. No. 29) Asta filed an answer to the complaint on April 25, 2014. (Dkt. No. 35) There are no motions currently pending in this action. My decision today in Neal's Declaratory Judgment Action, and confirmation of the Arbitration Award against NWS, Neal and Coyne, however, would seem to dispose of Coyne's Declaratory Judgment Action as well.

### D.   Asta's Petition to Confirm the Arbitration Award

Pursuant to the Court's directive dated April 10, 2014 (Declaratory Judgment Action, Dkt. No. 65), Asta filed a separate action on April 17, 2014, seeking to confirm the Arbitration Award. (Civ. No. 14-2495 ("Confirmation Action")) Asta moved to confirm the award against NWS only, pending the Court's determination as to whether Neal and Coyne were individually bound by the arbitration clause. (Dkt. No. 3) NWS has not opposed that motion. Neal and Coyne, however, have moved to dismiss the Confirmation Action. (Dkt. Nos. 7, 9) Coyne alternatively seeks to transfer the Confirmation Action to the United States District Court for the Central District of California. Asta has opposed both motions. (Dkt. Nos. 12, 13)

### E.   Coyne's Petition to Vacate the Arbitration Award

On April 21, 2014, Coyne instituted a proceeding against Asta to vacate the Arbitration Award in the United States District Court for the Central District of California. (Civ. No. 14-3034) That action was transferred to this Court on June 19, 2014, and assigned Civ. No. 14-3932. (Dkt. No. 17) Asta then moved to dismiss the complaint or to consolidate the action with the Confirmation Action. (Dkt. No. 22) Coyne has opposed the motion. (Dkt. No. 24)

### F.   Neal's Petition to Vacate the Arbitration Award

On June 4, 2014, Neal filed a complaint against Asta seeking to vacate the Arbitration Award. (Civ. No. 14-3550) Asta has moved to dismiss the action. (Dkt. No. 7) Neal has opposed the motion (Dkt. No. 9) and Asta has filed a reply (Dkt. No. 11).

## III.   PENDING MOTIONS

### A.   The Procedural Status

The procedural upshot is as follows. Because the arbitration was on the verge of completion, because Neal was in any event participating in his capacity as owner and managing partner of NWS, and because his arguments against jurisdiction were questionable, I declined to stay the arbitration on an emergent basis. I permitted the arbitration to proceed to an award, while also permitting Neal to reserve his right to contest the arbitrator's jurisdiction in

connection with motions to confirm or vacate any such award. On that jurisdictional question, I permitted the parties to take further discovery in connection with the actions filed in this Court. While discovery in the Declaratory Judgment Action was ongoing, events overtook us and the Arbitrator issued a Final Award.

By Order dated April 10, 2014, filed in the Declaratory Judgment Action, I directed that all motions to confirm, vacate, modify or correct the arbitration award be brought in a new and separate action which would be consolidated with the Declaratory Judgment Action for discovery purposes. (Dkt. No. 65) As noted above, Asta filed an action to confirm the award, and Neal and Coyne filed separate actions to vacate the award. By order dated December 29, 2014, Magistrate Judge Hammer consolidated the Declaratory Judgment Action, the Confirmation Action, and the two Actions to Vacate for discovery and pre-trial purposes. (Dkt. No. 97)

There are six pending motions in this now-consolidated action. Two relate to discovery disputes, and four are potentially dispositive.

**B.    Discovery Motions**

As noted, I ordered discovery relating to whether Neal could be individually bound by the ITS Agreement's arbitration clause and directed the parties to confer with Magistrate Judge Hammer in proceeding with such discovery. (Dkt. No. 44) Asta's submission to Judge Hammer requested documents regarding tax returns of NWS, Coyne and Neal, and all banking records for NWS-DE and NWS-WY. (Dkt. No. 52) Permitting many of the categories of requested documents set forth in Asta's pre-hearing letter, Judge Hammer limited two of the requests (which had sought all accounting, financial, book-keeping and banking records for NWS-DE and NWS-WY) to documents evidencing transfer of cash, currency, or other monetary assets between NWS, Neal and/or Coyne from the period of March 2007 to December 31, 2013. (Dkt. No. 70) Judge Hammer also ordered that Plaintiffs respond to the document requests by June 27, 2014.

Neal did not respond to Asta's discovery requests. Instead, Neal contended that his filing of a motion for summary judgment had the effect of staying discovery. (Dkt. No. 94-5) For its part, Asta contends that documents already produced by NWS in the arbitration are responsive to its requests in this action and should be produced, or alternatively that Asta should be granted leave to use those documents in this action. Following contentious correspondence between the parties, Asta notified the Court of the situation. (Dkt. No. 86) In response, Neal argued that because he could not be compelled to arbitrate, discovery was a waste of time. (Dkt. No. 89)

On November 20, 2014, Asta filed a motion to dismiss the complaint for failure to provide discovery pursuant to Fed. R. Civ. P. 37, based on Neal's refusal to abide by the discovery order. (Dkt. No. 94) Neal has opposed the motion, contending that because of his pending motion for summary judgment "there is no need for discovery." (Dkt. No. 95) Asta has filed a reply. (Dkt. No. 96)

The second discovery-related motion concerns subpoenas directed to Bank of America and First Republic Bank. On June 20, 2014, Asta served Bank of America and First Republic Bank with subpoenas ("Bank Subpoenas") containing twelve requests. Neal filed a motion to quash the Bank Subpoenas on June 30, 2014, and requested the imposition of sanctions against Asta, on the grounds that the Bank Subpoenas violated Judge Hammer's order which had modified Asta's financial records requests. (Dkt. No. 84)  On March 10, 2015, Magistrate Judge Hammer issued an order granting in part and denying in part Neal's motion to quash the Bank Subpoenas. (Dkt. No. 103) Finding that the Bank Subpoenas did not entirely conform to his prior order, Judge Hammer directed the issuance of new subpoenas directed at only four of the original requests; specifically, documents regarding withdrawals or transfers of funds from any account opened by Neal NWS-DE and/or NWS-WY, monthly account statements, deposit slips, canceled checks, or other documents reflecting wire transfers, and tax forms issued by the banks to Neal, NWD-DE and/or NWS-WY. Judge Hammer also ordered that the subpoenas be limited in

time to apply to documents from March 2007 to December 31, 2013. Neal has appealed Magistrate Judge Hammer's order to this Court, seeking that the Court quash the Bank Subpoenas in their entirety or stay the issuance of the subpoenas until a decision has been rendered on the summary judgment motions. (Dkt. No. 104) Asta filed a letter-brief in opposition to the appeal. (Dkt. No. 105)

### C.   Dispositive Motions

The other pending motions are for summary judgment. On July 7, 2014, Neal filed a motion for summary judgment. (Dkt. No. 85) Asta opposed and Neal filed a reply. (Dkt. Nos. 88, 91) On July 10, 2015, Asta filed its own motion for summary judgment. (Dkt. No. 117) Neal moved to strike certain exhibits included in Asta's summary judgment motion. (Dkt. No. 154) That motion appears to present the same arguments Neal presented in response to Asta's motion to dismiss for failure to provide discovery, namely, that adjudication of his summary judgment motion did not require a factual analysis because the law was (according to Neal) clear that he could not be forced to arbitrate, and that therefore Asta should not have submitted documentary evidence in support of its motion for summary judgment. Asta has opposed that motion (Dkt. No. 156), and Neal and Coyne have filed a joint reply (Dkt. No. 162) Finally, Neal and Coyne cross-moved for summary judgment. (Dkt. No. 158)  Asta opposed the motion for summary judgment (Dkt. No. 163) and Neal and Coyne have submitted a joint reply (Dkt. No. 166)[4]

---

[4]     The summary judgment motions are based on a documentary record that is similar to that before the Arbitrator.

It appears that the only documents relating to NWS's corporate structure and operations were those that were produced in the Arbitration proceeding. In the Arbitration, NWS, through Neal, produced four DVDs containing thousands of documents (consisting of emails and attachments). Asta, however, states that those documents are all Asta-owned documents sent by Neal from his Asta-owned computer to his personal computer. (Asta SOF ¶ 92) With respect to NWS's corporate documents specifically, NWS (through Neal) seems to have produced only a limited universe of documents. By letter dated May 1, 2013, Neal purports to have produced the following: (1) NWS-DE's Federal Tax Return for 2009, (2) NWS-WY's Federal Tax

## IV.   LEGAL ANALYSIS

The arbitration was based on an ITS Agreement between Asta and NWS. The arbitrator entered his award, not only against NWS, but against its principals, Neal and Coyne. Before the Court are dueling motions to confirm or vacate the award, and motions for summary judgment.

In Section IV.A, *infra*, I briefly review the legal standards governing review of arbitration awards and motions for summary judgment.

In Section IV.B, I discuss the confirmation of the award as against NWS. As to that limited issue, there is no dispute; the award is confirmed, and judgment is entered against NWS. The issue that remains, however, is whether

---

Return for 2010, (3) NWS's bank statements for the period of June 2009 to January 2010, and (4) Neal's personal tax returns for the years 2009-2011. (Asta Ex. 6) Asta contends that with respect to the bank statements, in fact only account statements from May 2009 to July 2009 were produced. (Asta Reply Cert. (Dkt. No. 163-1) ¶ 36) Furthermore, although Neal's May 1, 2013 letter explained that tax returns for the years 2011 and 2012 were not yet prepared, NWS failed to produce those forms at any later time. (Asta SOF ¶ 117)

Asta learned from Neal's May 1, 2013, letter that NWS was dissolved in 2010 and "acquired by a different New World Solutions, Inc." (Asta Ex. 6) Although Asta requested documents regarding this dissolution and acquisition, the transfer of interests from NWS-DE to NWS-WY, and (when it learned of it) Coyne's transfer of his interest in NWS-WY to Neal, NWS and Neal failed to produce any documents in response to these requests during the Arbitration. (Asta SOF ¶¶ 118-119, 131, 135). It does not appear that documents responsive to those requests were produced in the Declaratory Judgment Action, either. In fact, Asta contends that Neal has not produced a single corporate record in the Declaratory Judgment Action. (*Id.* ¶ 120) Any information cited by Asta in its summary judgment papers comes from either deposition testimony of Coyne and/or Neal, or from documents Asta obtained from a different action, *New World Solutions, Inc. v. NameMedia, Inc.*, Civ. No. 7:11-2763, in the Southern District of New York. (*See, e.g.*, Asta Ex. 34)

With regard to SISI and the relationship between that entity and NWS, Neal, and Coyne, any relevant documents appear to have been produced in the Arbitration. Asta requested, and the Arbitrator issued, a subpoena to Bank of America for SISI-related documents on June 21, 2013. (Asta Ex. 19) In response to this subpoena, Bank of America produced SISI account records, which are included in Asta's exhibits in support of its motion for summary judgment. (*See* Exs. 20, 21) According to Asta, these documents showed that SISI's accounts were controlled by Coyne, that Coyne used money from these accounts for personal use, and that Coyne transferred sums from SIS to NWS. (Asta SOF ¶¶ 154-55) It does not appear that any other documents were produced regarding SISI.

that judgment against NWS may permissibly extend to Neal and Coyne individually.

In Section IV.C, I address the issue of the arbitrator's jurisdiction over the individuals *via* review of the Arbitrator's Jurisdiction Award. The arbitrator found, primarily by a veil-piercing analysis, that the ITS Agreement bound Neal and Coyne and therefore entered judgment against those two individuals, as well as NWS. I confirm that Jurisdiction Award. In the alternative, *via* cross-motions for summary judgment, brought after an opportunity for full discovery in this Court, I independently find that Neal and Coyne are bound.

In Section IV.D, I briefly discuss miscellaneous grounds to vacate the arbitrator's final award, and in Section V.E, I dispose of miscellaneous motions.

## A.    Legal Standards

### 1.    Review of an arbitration award

The standard applied by a federal court in reviewing an arbitration award "could be generously described only as extremely deferential." *Bellantuono v. ICAP Secs. USA, LLC*, 557 F. App'x 168, 173 (3d Cir. 2014) (quoting *Dluhos v. Strasberg*, 321 F.3d 365, 372 (3d Cir. 2003)). "[M]indful of the strong federal policy in favor of commercial arbitration, we begin with the presumption that the award is enforceable." *Sutter v. Oxford Health Plans LLC*, 675 F.3d 215, 219 (3d Cir. 2012), *aff'd*, __ U.S. __, 133 S. Ct. 2064 (2013).

Section 10(a) of the FFA provides the grounds upon which a district court may vacate an arbitration award:

(1) where the award was procured by corruption, fraud, or undue means;

(2) where there was evident partiality or corruption in the arbitrators, or either of them;

(3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or

(4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a).

The Supreme Court has held that these are the "exclusive grounds" for moving to vacate an award. *Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 584, 128 S. Ct. 1396 (2008).[5]

## 2.    Summary judgment

I have also permitted the parties to take discovery and couch their contentions as motions for summary judgment in this Court. Thus, in addition, to reviewing the findings of the arbitrator, I make my own, independent findings, particularly as to veil-piercing and the issue of the Arbitrator's jurisdiction over Asta's claims against Neal and Coyne.

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505 (1986); *Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000). In deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Boyle v. County of Allegheny Pennsylvania*, 139 F.3d 386, 393 (3d Cir. 1998) (citing *Peters v. Delaware River Port Auth. of Pa. & N.J.*, 16 F.3d 1346, 1349 (3d Cir. 1994)). The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S. Ct. 2548 (1986). "[W]ith respect to an issue on which

---

[5]     Before *Mattel*, this Circuit and others permitted arbitration awards to be vacated where the arbitrator's decision evidenced a manifest disregard for the law. *Bellantuono*, 557 F. App'x at 173. That standard required that the arbitrator was aware of, but ignored, legal precedent. *See id.* "Manifest disregard" is far more than mere legal error: if an "'arbitrator is even arguably construing or applying the contract and acting within the scope of his authority,' the fact that 'a court is convinced he committed serious error does not suffice to overturn his decision.'" *E. Associated Coal Corp. v. United Mine Workers of Am., Dist. 17*, 531 U.S. 57, 62, 121 S. Ct. 462 (2000) (quoting *United Paperworkers Int'l Union, AFL–CIO v. Misco, Inc.*, 484 U.S. 29, 38, 108 S. Ct. 364 (1987)). It remains an open question in this Circuit whether the "manifest disregard of the law" standard previously invoked as a ground to vacate an arbitration award survives *Mattel*. *See Whitehead v. Pullman Grp., LLC*, 811 F.3d 116, 120–21 (3d Cir. 2016) (noting that the Third Circuit has yet to weigh in on this issue).

the nonmoving party bears the burden of proof ... the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.

Once the moving party has met that threshold burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348 (1986). The opposing party must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; *see also* FED. R. CIV. P. 56(c) (setting forth types of evidence on which nonmoving party must rely to support its assertion that genuine issues of material fact exist). "[U]nsupported allegations ... and pleadings are insufficient to repel summary judgment." *Schoch v. First Fid. Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990); *see also Gleason v. Norwest Mortg., Inc.*, 243 F.3d 130, 138 (3d Cir. 2001) ("A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial."). If the nonmoving party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial ... there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992) (quoting *Celotex*, 477 U.S. at 322–23).

### B.    Confirmation of Award Against NWS

Where the arbitration concerns a transaction involving interstate commerce, it is governed by the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.* ("FAA"). That is undeniably the case here: the ITS Agreement was between Asta and NWS, corporations of different states.

Sections 10 and 11 of the FAA state narrow grounds to vacate or modify an arbitration award. *See, e.g.*, 9 U.S.C. § 10 (fraud, corruption, partiality, misconduct, acting in excess of powers). NWS has not set forth any such grounds. Indeed, NWS has not opposed the motion to confirm the award or brought a motion to vacate it. As to NWS, then, the award is presumptively enforceable.

In any event, whether on a summary judgment standard or an ordinary confirmation motion, I find that the award should be confirmed as against NWS. The Arbitrator's opinion reflects a careful consideration of the applicable law and the evidence presented during six days of hearings. The result is a well-reasoned determination that NWS breached the ITS Agreement and committed fraud and consumer fraud. I find that the Award is supported by the record; there is nothing here to upset the general policy of upholding arbitration awards.

The Court will therefore confirm the Arbitration Award against NWS, and enter judgment.

## C.   Arbitrator's Jurisdiction as to Neal and Coyne

I continue with the issue of the arbitrator's jurisdiction to decide claims against NWS's principals, Neal and Coyne. In his Jurisdiction Award, the Arbitrator found that he was authorized to arbitrate the claims, not only as against NWS, but as against Neal and Coyne as well. Neal and Coyne, by various procedural vehicles, argue that the Arbitrator erred in determining that he had jurisdiction over claims against them individually. They contend that this determination cannot be made by an arbitrator, but is for the courts alone.

I affirm the arbitrator's Jurisdiction Award, holding that he could extend his jurisdiction to include Neal and Coyne. In the alternative, however, I have permitted discovery and authorized the parties to brief the issues surrounding the arbitrator's jurisdiction. Applying a summary judgment standard, I independently find that Neal and Coyne are bound, and decline to vacate the Arbitrator's award on jurisdictional grounds.

### 1.   Who decides arbitrability?

### a.   The Court, on summary judgment

One procedural route to settling the issue of the arbitrator's jurisdiction as to Neal and Coyne is a straightforward decision by this Court, based on the record compiled by the parties, employing a summary judgment standard.

The issue of the arbitrator's jurisdiction to hear a case is, by default, one to be decided by the Court. *See AT&T Techs., Inc. v. Comm'ns Workers of America*, 475 U.S. 643, 651, 106 S. Ct. 1415 (1986). Although an arbitrator may resolve procedural issues and the merits of the dispute, an arbitrator may not ordinarily resolve the question of whether he or she has jurisdiction to arbitrate, or the scope of that jurisdiction. *See Puleo v. Chase Bank USA, N.A.*, 605 F.3d 172, 183 (3d Cir. 2010). If contested, that question—whether the dispute can be arbitrated at all—requires a ruling by the court. *Sandvik AB v. Advent Int'l Corp.*, 220 F.3d 99, 111 (3d Cir. 2000) ("[A]llow[ing] the arbitrators to determine their own jurisdiction is not permitted in the federal jurisprudence of arbitration, for the question whether a dispute is to be arbitrated belongs to the courts unless the parties agree otherwise.") (citing *First Options*, 514 U.S. at 944). "[S]ilence or ambiguity on the 'who should decide arbitrability' point must be resolved in favor of judicial resolution of questions of arbitrability." *First Options*, 514 U.S. at 945. *See also Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 445–46, 126 S. Ct. 1204 (2006); *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 403–04, 87 S. Ct. 1801 (1967).

Asta has filed an action to confirm the arbitration award. Neal and Coyne have filed federal court actions seeking to vacate the arbitration award because, they say, the Arbitrator acted in excess of his authority, which rightfully extended only to claims against NWS. *See* 9 U.S.C. § 10(a)(4). I afforded both sides the opportunity to conduct discovery. Both sides have now filed summary judgment motions on the issue of arbitrability of the claims against Neal and Coyne. I am therefore poised to decide the jurisdictional issue, employing the usual Rule 56 standard. *See* Section I.B, *supra. Cf.*

*Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 771 (3d Cir. 2013) (Rule 56 furnished the correct standard for determining arbitrability issue on a motion to compel arbitration).

### b.    The Arbitrator, if authorized by contract

Here, however, the Arbitrator himself ruled that he possessed jurisdiction. I therefore consider the jurisdictional issue by the alternative route of review of the Arbitrator's Jurisdiction Award. To do so, however, I must be satisfied that the Arbitrator was empowered to make that jurisdictional ruling in the first place.

The axiom that the Court should decide arbitrability issues is subject to the still more fundamental principle that the parties may contract for a contrary result. An agreement may validly provide that the arbitrator is to determine his or her own jurisdiction. *Sandvik*, 220 F.3d at 112 ("[A]llow[ing] the arbitrators to determine their own jurisdiction is not permitted in the federal jurisprudence of arbitration, for the question whether a dispute is to be arbitrated belongs to the courts *unless the parties agree otherwise*.") (emphasis added); *Laborers' Local Union Nos. 472 and 172 v. Interstate Curb & Sidewalk*, 448 A.2d 980, 984 (N.J. 1982) ("*In the absence of an express contract provision conferring authority on the arbitrator*, it is uniquely within the province of the courts, and not arbitrators, to make the initial and threshold determination regarding the arbitrability of a particular issue.") (emphasis added). That commitment of the issue to the arbitrator must be clear and unmistakable. *Chesapeake Appalachia, LLC v. Scout Petroleum, LLC*, 809 F.3d 746, 753 (3d Cir. 2016) (citing *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83, 123 S. Ct. 588 (2002) (questions of arbitrability are "for judicial determination unless the parties clearly and unmistakably provide otherwise").

The next question, then, is whether this ITS Agreement commits questions of arbitrability to the Arbitrator. The ITS Agreement's arbitration clause provides that the arbitration will be conducted "in accordance with the Commercial Arbitration Rules of the American Arbitration Association ('AAA')."

(Asta Ex. 1 § 6.2) Section R-7(a) of the Commercial Arbitration Rules provides that "the arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement." By agreeing to arbitrate in accordance with AAA rules, the parties to the ITS Agreement clearly and unmistakably agreed to arbitrate the issue of arbitrability. *See In re EnCap Golf Holdings, LLC*, 2009 WL 2488266, at *4 (D.N.J. Aug. 10, 2009) ("The fact that the [Agreement] incorporates the AAA Construction Rules and that [] these rules provide[] that the arbitrator shall have the authority to determine jurisdiction constitutes clear and unmistakable evidence."); *Hudson Tea Blgds. Condo. Ass'n, Inc. v. Block 268, LLC*, 2013 WL 1802860, at *4 n.6 (N.J. Super. Ct. App. Div. Apr. 29, 2013) (citing *Contec Corp. v. Remote Solution Co., Ltd.*, 398 F.3d 205, 208 (2d Cir. 2005) ("We have held that when, as here, parties explicitly incorporate rules that empower an arbitrator to decide issues of arbitrability, the incorporation serves as clear and unmistakable evidence of the parties' intent to delegate such issues to an arbitrator.").

That said, it is important to reflect on the particular kind of arbitrability issue that is presented here. This dispute is not, for example, over the scope of issues that may be arbitrated between the contractual parties. Rather, Neal and Coyne deny that they can be regarded as "parties" to the agreement at all. May A and B, by contract, provide that an arbitrator may assert jurisdiction as to C, a total stranger? Surely not; the principle stated in *Chesapeake* and applied in cases such as *EnCap* is not without limits.

This case, I believe, falls within acceptable bounds, for reasons discussed more fully in the following section. Neal and Coyne are not strangers to the contract. The whole purpose of the ITS Agreement was the securing of Neal's services. Neal and Coyne (later, Neal alone) were the sole owners and officers of the NWS entities. Neal, at least, was already before the arbitrator in connection with defending the claims against NWS. The arbitrator, considering the evidence as to NWS, found that it was used as a vehicle for fraud and that it

was not maintained formally as an independent corporation. Neal knew, or must be deemed to have known, that the corporate form, if abused, would not protect him from personal liability under the ITS Agreement.

I therefore consider in the alternative whether to confirm the Arbitrator's Jurisdiction Award as to the individual principals of NWS.

### 2.   Claims against Neal and Coyne

In this section, I conclude that the claims against Neal and Coyne were properly arbitrable. This may be viewed as confirmation of the Arbitrator's Jurisdiction Award; in the alternative, it may be viewed as this Court's independent determination on summary judgment after a full opportunity for federal-court discovery. The evidence in either case is similar, and it leads to the same conclusion: the arbitrator, having asserted unquestioned jurisdiction over NWS, properly extended that jurisdiction over the claims as against Neal and Coyne.

"The FAA instructs courts to refer to principles of applicable state law when determining the existence and scope of an agreement to arbitrate." *Trippe Mfg. Co. v. Niles Audio Corp.*, 401 F.3d 529, 532 (3d Cir. 2005). Accordingly, I look to New Jersey state law. There is "no dispute that a non-signatory cannot be bound to arbitrate unless it is found 'under traditional principles of contract and agency law' to be akin to a signatory of the underlying agreement." *E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.*, 269 F.3d 187, 194 (3d Cir. 2001) (citing *Bel–Ray Co., Inc. v. Chemrite (Pty) Ltd.*, 181 F.3d 435, 444 (3d Cir. 1999)). "There are five theories for binding non-signatories to arbitration agreements: (1) incorporation by reference, (2) assumption, (3) agency, (4) veil-piercing/alter ego, and (5) estoppel." *Trippe*, 401 F.3d at 532.

Here, there is no doubt that the arbitrator had jurisdiction over NWS, and I have confirmed his finding that NWS, acting through Neal and Coyne, defrauded Asta. Building on that unquestioned jurisdiction, the Arbitrator considered whether he had jurisdiction to bind NWS's principals, Neal and

Coyne. He determined that he had jurisdiction over Neal and Coyne under a theory of corporate veil piercing. He also asserted jurisdiction over Neal on an estoppel theory. In these federal actions, Asta also contends that Neal and Coyne are bound *via* an agency theory (rejected by the arbitrator), as well as Neal's status as NWS's successor in interest. I will address each theory in turn.

### a.   Veil piercing/Alter ego

A non-signatory may be bound to arbitrate when it is an alter ego of the signatory party. In this context, that means that an arbitrator or court may pierce the veil of a corporate signatory and reach the corporation's owner or officer. *See, e.g., Hirsch,* 71 A.3d at 857; *Kaplan v. First Options of Chicago, Inc.,* 19 F.3d 1503, 1520 (3d Cir. 1994), *aff'd,* 514 U.S. 939 (1995).

A corporation is a legal person in its own right, and a shareholder is not routinely liable for corporate obligations. The corporate form will be disregarded, however, where it has been used to perpetuate fraud or wrongdoing. *Lyon v. Barrett*, 445 A.2d 1153, 1156 (1982) (holding that "[i]n the absence of fraud or injustice, courts generally will not pierce the corporate veil to impose liability on the corporate principals"); *see also Yacker v. Weiner,* 263 A.2d 188, 191 (N.J. Super. Ct. Ch. Div. 1970) (holding that "[i]t is fundamental that a corporation is an entity wholly separate and distinct from the individuals who compose and control it, but the corporate cloak may not be utilized as a subterfuge to justify wrong or perpetuate fraud"), *aff'd,* 277 A.2d 417 (N.J. Super. Ct. App. Div. 1971); *Trachman v. Trugman,* 175 A. 147, 149 (N.J. Ch. 1934) (holding that "[w]here the corporate form is used by individuals for the purpose of evading the law, or for the perpetration of fraud, the courts will not permit the legal entity to be interposed so as to defeat justice").

Thus, the alter ego doctrine may be used to "undercut schemes in which a shell corporation's affairs and personnel are a sham to disguise an alter ego corporation's wrongdoing." *N.J. Carpenters Funds v. Eng'd Framing Sys.,* 2008 WL 230590, at *3 (D.N.J. Jan. 25, 2008) (citing *Kaplan, Inc.,* 19 F.3d at 1520–21). Indicia of such a "sham" include failure to observe corporate formalities;

siphoning of funds; absence of corporate records; or use of the corporation as a façade for the operations of the dominant shareholders. *Id.* (citing *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 484–85 (3d Cir. 2001)). For the doctrine to apply, "the evidence must show that the corporation's owners abused the legal separation of a corporation from its owners and used the corporation for illegitimate purposes." *Kaplan*, 19 F.3d at 1521 (citing *Zubik v. Zubik*, 384 F.2d 267, 267 (3d Cir. 1967)).

Here, the evidence supports the conclusion that Neal and Coyne employed NWS as an alter ego. Most generally, the history shows that NWS was essentially a mere pass-through. Its purpose was to be a vehicle for Neal's personal provision of IT services.

Neal and Coyne were the sole owners and directors of NWS, in both its incarnations – Delaware and Wyoming. There were no other owners, officers, directors, or even employees of either entity. Two tax returns are the sole corporate records of NWS-DE or NWS-WY that appear in the record. There is no documentary evidence of corporate formalities' ever having been observed.

Indeed, Neal and Coyne seem to have treated "NWS" as a floating designation for whichever entity they currently wished to employ. Asta entered into the ITS Agreement with NWS-DE. That entity, however, was dissolved shortly after NWS-WY was formed in 2012. Asta was never notified that this dissolution had occurred, or that the entity it contracted with was now defunct. A new entity, NWS-WY, silently stepped into the shoes of NWS-DE. NWS-WY, however, proved to be an on-again, off-again entity. When the arbitration was commenced, NWS-WY had been dissolved (again, without notice to Asta). NWS-WY was momentarily reinstated for the purpose of filing a Counterclaim, but then winked out of existence again.

Aside from after-the-fact deposition testimony, there is no explanation of those corporate machinations. In that deposition testimony, the reasoning of the two principals is fuzzy at best.

NWS (either version) maintained no significant assets, let alone assets commensurate with the liabilities likely to be incurred. All of the payments

NWS received from Asta under the ITS Agreement, amounting to over $4 million, were funneled to its principals, Neal and Coyne. (Asta SOF ¶ 75) It seemed that NWS retained little or nothing, and served as a mere pass-through. Just months after Asta terminated the ITS Agreement in June 2012, NWS was insolvent. Coyne testified at his deposition that, when he transferred his interest in NWS-WY to Neal, NWS had no assets aside from the claims it was asserting against Asta. (Asta Ex. 22 (Coyne Dep.) 88:15–89:14) Shortly after Neal filed the Counterclaim in arbitration on behalf of NWS-WY, the corporation was dissolved for a second time. Neal was thus the sole potential beneficiary of any recovery on that Counterclaim. In short, NWS was an empty, judgment-proof shell, moribund but fleetingly revived for the purpose of asserting claims against Asta, the benefit of which would flow to Neal.

In light of the above, I find it appropriate to pierce the corporate veil and to find NWS to be the alter ego of Coyne and especially Neal. I so find from two technically distinct points of view. First, I confirm the Arbitrator's Jurisdiction Award on this basis. Second, I find independently, based on cross-motions for summary judgment after a full opportunity for discovery, that jurisdiction was appropriate.

I digress from the jurisdictional analysis to note a third approach. Veil-piercing might well be appropriate as a direct and substantive matter. That is, the judgment against NWS that I enter today, like any judgment against a corporate entity, might be enforced against its owners and principals under traditional veil-piercing principles. That analysis does not depend on anything that occurred in the arbitration. I do not, however, decide that issue, which has not been squarely presented, and I return to the jurisdictional analysis.

### b.     Estoppel

A non-signatory may be bound to an arbitration agreement under the theory of equitable estoppel, if found to have "reaped the benefits" of the contract containing the arbitration clause. *Griswold v. Coventry First LLC*, 762 F.3d 264, 272 (3d Cir. 2014) (quoting *Invista S.A.R.L. v. Rhodia, S.A.*, 625 F.3d

75, 85 (3d Cir. 2010)). This exception to the rule that non-signatories may not be bound to an arbitration agreement is a narrow one. *See Griswold*, 762 F.3d at 274. The New Jersey Supreme Court has explained that the exception has "limited applicability" and cannot be applied solely on the grounds that the parties and claims are intertwined. *Hirsch v. Amper Fin. Servs., LLC*, 71 A.3d 849, 859–60 (N.J. 2013).

Under one version of equitable estoppel, "courts have held non-signatories to an arbitration clause when the non-signatory knowingly exploits the agreement containing the arbitration clause despite never having signed the agreement." *DuPont*, 269 F.3d at 199. A non-signatory can be bound under this "knowingly exploits" theory where it "embraces the agreement and directly benefits from it." *Griswold*, 762 F.3d at 272. "A nonsignatory can 'embrace' a contract in two ways: (1) by knowingly seeking and obtaining direct benefits from that contract; or (2) by seeking to enforce terms of that contract or asserting claims" based on the contract *Haskins v. First Am. Title Ins. Co.*, 866 F. Supp. 2d 343, 350 (D.N.J. 2012). I consider both.

### i.      **Estoppel of direct beneficiary**

A non-signatory may be bound to arbitrate where a non-signatory has obtained, or has sought to obtain, benefits flowing from the contract. *Eric Baker Architecture, P.C. v. Mehmel*, 2013 WL 6169210 at *4 (N.J. Super Ct. App. Div. Nov. 26, 2013) (declining to apply equitable estoppel where there was no evidence that non-signatories sought direct benefits under the contract during its lifetime). In other words, where a non-signatory has benefited from the contractual relationship between the signatory parties, that non-signatory may be estopped from denying arbitration. *See Bayonne Drydock & Repair Corp. v. Wartsila N. Am., Inc.*, 2013 WL 3286149, at *6 (D.N.J. June 28, 2013) (applying equitable estoppel where non-signatory was beneficiary of contract because without the contract, the non-signatory would not have been the one performing the work).

Here, Neal is a direct beneficiary of the ITS Agreement. It is undisputed that Neal had been providing IT services to Asta since 2004. (Asta SOF ¶¶ 35–36) Originally, Neal was retained through Bach Consulting, an entity owned by Coyne, until 2007, at which point Coyne sought to dissolve the company. (*Id.* ¶¶ 36–39) Neal told Asta that Bach Consulting would be discontinued, at which point either Asta requested or Neal affirmatively told Asta that he and Coyne would create a new entity, NWS, to replace Bach Consulting. (*Id.* ¶ 40) After NWS-DE was formed, Neal continued to provide IT services to Asta, even before the ITS Agreement was signed. (*Id.* ¶¶ 41–42) Under the terms of the ITS Agreement, NWS was to designate a person as its Point of Contact and IT Services Manager. Neal was designated to be both. (*Id.* ¶ 52) In fact, the very purpose of entering into the ITS Agreement was to ensure that Neal would continue to provide IT services to Asta. (*Id.* ¶ 62) Thus, Neal was the intended beneficiary of the contract in that it facilitated his employment. Furthermore, Neal was paid in accordance with the ITS Agreement, and deposition testimony confirms that all payments NWS received from Asta for IT services were passed through to Neal and Coyne. Accordingly, the record supports the conclusion that Neal was a direct beneficiary of the contract and may be estopped from avoiding arbitration purely on the grounds that he was not a signatory.

### ii.    Estoppel by asserting claim under contract

A non-signatory may also be estopped from denying the obligations in a contract where the non-signatory has sought to enforce or exploit the arbitration clause or other provisions of the contract itself. *See Quanqing (Changshu) Cloth-Making Co. Ltd. v. Pilgrim Worldwide Trading, Inc.*, 2010 WL 2674589, at *3 (D.N.J. June 29, 2010) (citing *DuPont*, 269 F.3d at 199); *Hirsch*, 71 A.3d at 195 (declining to apply equitable estoppel where record did not suggest that non-signatories "expected to reap the benefits that accompany arbitration"). In other words, a non-signatory may not seek enforcement of certain contractual provisions while at the same time "turning its back on the portions of the contract, such as an arbitration clause, that it finds

distasteful." *DuPont,* 269 F.3d at 200; *Haskins,* 866 F. Supp. 2d at 350
("[E]quitable estoppel prevents a non-signatory from "cherry-picking" beneficial
contract terms while ignoring other provisions that don't benefit it or that it
would prefer not to be governed by such as an arbitration clause.") (citing
*Invista,* 625 F.3d at 85).

Here, it is clear that Neal attempted to use the contract as a sword at the
same time as using his non-signatory status as a shield. Neal signed NWS's
Counterclaim against Asta in November of 2012. Indeed, after December 2012
when Coyne assigned his interest in NWS-WY to Neal, Neal became the sole
beneficiary of the Counterclaim. That Counterclaim is premised entirely on the
ITS Agreement. *See Griswold,* 762 F.3d at 273 (noting that in order for estoppel
to apply, the claims must be based directly on the agreement). In Count 1, the
Counterclaim asserted that Asta owed NWS for unpaid "services rendered
under the contract." (Asta Ex. 10 ¶ 53) Count 2 sounds in breach of contract,
alleging that Asta had contracted with NWS for NWS to be the exclusive
provider of "Basic Services" outlined in the ITS Agreement, but that Asta
breached this provision in obtaining IT services from other providers. (*Id.* ¶¶
61–71) The third cause of action also sounds in breach of contract, on the
grounds that Asta improperly terminated the ITS Agreement in violation of its
termination provisions. (*Id.* ¶¶ 73–85) Although the Counterclaim is brought by
NWS, it is signed by Neal. Neal was the only one who stood to gain from this
Counterclaim because, as noted, (1) NWS-WY was insolvent at the time the
Counterclaim was filed, (2) NWS-WY was dissolved shortly after the
Counterclaim was filed, and (3) Coyne transferred his interest in NWS-WY to
Neal in December of 2012, rendering Neal the sole beneficiary of NWS-WY.
Thus, it is evident that Neal, through NWS, sought to enforce the provisions of
the ITS Agreement, including the Services and Termination provisions; he
cannot both enforce those provisions of the ITS Agreement but seek to avoid
the arbitration clause also contained therein. Accordingly, I find that Neal is
bound to arbitrate under the theory of equitable estoppel.

### c.   Agency

Alternatively, a non-signatory may be bound to arbitrate under traditional agency principles. "Because a principal is bound under the terms of a valid arbitration clause, its agents, employees, and representatives are also covered under the terms of such agreements." *Pritzker v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 7 F.3d 1110, 1121 (3d Cir. 1993) (citing *Arnold v. Arnold Corp.*, 920 F.2d 1269, 1281–82 (6th Cir. 1990) (finding financial consultant employee bound to arbitrate); *see also Reljic v. Tullett Prebon Americas Corp.*, 2011 WL 2491342, at *5 (D.N.J. June 21, 2011) ("Because a principal is bound under the terms of a valid arbitration clause, its agents, employees, and representatives are also covered under the terms of such agreements."). Because corporations can only act through individuals, it follows that where the individuals' acts are directly related to the alleged violations underlying the dispute, the arbitration clause should be extended to agents of the signatory party. *See id.* at 1122. The rule set forth in *Pritzker*, however, has been held to apply only to when a non-signatory seeks to <u>invoke</u> the arbitration agreement entered into by its principal, rather than the other way around when a non-signatory seeks to <u>avoid</u> the arbitration agreement. *See Tracinda Corp. v. DaimlerChrysler AG*, 502 F.3d 212, 224–25 (3d Cir. 2007) (distinguishing *Bel-Ray*, 181 F.3d 435 (3d Cir. 1999) from *Pritzker*, 7 F.3d 1110 (3d Cir. 1993)); *see also Hirsch*, 71 A.3d at 859 ("arbitration may be compelled by a non-signatory against a signatory to a contract on the basis of agency principles"). I am not aware of any cases in this Circuit or from New Jersey in which agency principles were applied to compel a non-signatory to arbitrate where that non-signatory was seeking to avoid arbitration. Consequently, I do not rest my decision on this basis.

### d.   Successor in interest

Finally, Asta argues that Neal should be bound to arbitrate because he is NWS's successor in interest, and as such is bound by the ITS Agreement. Under Section 14.8, the ITS Agreement provided that it is "binding upon the

Parties hereto and their respective permitted assigns and successors in interest." The contracting party to the ITS Agreement was "New World Solutions, Inc. ('NWS'), a Delaware corporation." (Asta Ex. 1) NWS-DE was incorporated on March 26, 2007. (Asta SOF ¶ 20) Neal and Coyne were the sole officers and directors of NWS-DE and each owned fifty percent of the entity. (*Id.* ¶ 21) NWS-DE was dissolved on July 12, 2010, but prior to that date, Coyne incorporated NWS-WY in Wyoming. That new entity apparently acquired NWD-DE, or at least was treated as a successor. (*Id.* ¶¶ 22, 24) Coyne and Neal again held 50/50 interests in NWS-WY and were the sole officers and directors. (*Id.* ¶ 31) On December 6, 2012, Coyne transferred his interest in NWS-WY to Neal, who became the sole owner. (*Id.* ¶ 132) Then NWS-WY was dissolved. It is clear from the record that Neal was a successor-in-interest to NWS-DE, the contracting party, and is therefore properly considered as bound by the ITS Agreement.

In sum, I find that Neal and Coyne were individually bound to arbitrate under theories of veil piercing, equitable estoppel, and (as to Neal) successor in interest. Accordingly, the award may be confirmed against them even though they refused to participate in the arbitration proceeding. *See Laborers' Local Union Nos. 472 and 172*, 448 A.2d at 985 ("If a party bound to arbitrate chooses to ignore the arbitration and await an action upon the award, it takes the risk that it will be found obliged to arbitrate and, hence, bound by the award."); *NJ Mfgs. Ins. Co. v. Franklin*, 389 A.2d 980, 984 (N.J. Super. Ct. App. Div. 1978) (noting that objections to arbitrability may be made even up to the time of the confirmation action). The Arbitrator found that it was appropriate to pierce the corporate veils of the NWS entities as they were alter-egos for Neal and Coyne and that the individual respondents were liable, jointly, severally, and in the alternative, for the damages awarded to Asta. As noted above, none of the Section 10 grounds for vacating an arbitration award are presented here. Having found that NWS was a vehicle for fraud, the Arbitrator appropriately

found Neal and Coyne, the sole human beings through which NWS acted, to be jointly and severally liable. *See Vitarroz Corp. v. G. Willi Food Intern. Ltd.*, 637 F. Supp. 2d 238, 248 (D.N.J. 2009) (finding imposition of joint and several liability against actual wrongdoers, subsidiaries of the signatory corporation, to be within the "wide latitude" afforded to arbitrators "in fashioning an appropriate remedy") (citations omitted). Accordingly, I find that confirmation of the Award, over the jurisdictional objections, is appropriate.

### D.   Confirmation of Final Award against Neal and Coyne

The arbitrator's jurisdiction aside, Neal and Coyne have opposed confirmation and moved to vacate the Final Award on a number of substantive grounds.

First, Neal argues that Asta made false statements to the arbitrator. This I construe to be an argument that the award should be vacated under Section 10(a)(i) – that the award was procured by corruption, fraud, or undue means. Specifically, Neal takes issue with certain facts presented by Asta relating to whether Neal improperly sent Asta documents and business emails to his personal account and whether Neal improperly wiped the hard-drive. In essence, Neal is disputing Asta's claims, contending that he was permitted to forward the emails pursuant to Asta's policy and that a third party wiped the hard-drive at Asta's instruction in retaliation for Neal's alleged whistleblowing activity. Such wrangling over facts does not support the conclusion that the arbitration award was procured by fraudulent means. The Arbitrator carefully reviewed the evidence submitted and found that it had been shown by "clear and convincing evidence" that Neal had diverted emails and documents to his personal account in a manner that exceeded his authorized access, without a legitimate business purpose, and that Neal had deleted information from Asta-supplied computers. (Final Award pp. 17–18) The record does not support a finding that this determination was a result of fraud or corruption.

Second, Neal contends that the arbitrator refused to hear relevant evidence. Under § 10(a)(3), an award may be vacated where there is misconduct by the arbitrator, including the arbitrator's having refused to hear evidence

pertinent and material to the controversy. The Third Circuit has noted that the arbitrator's error in this regard "must be one that is not simply an error of law, but which so affects the rights of a party that...he was deprived of a fair hearing." *N.J. Bldg. Laborers Dist. Councils Local 325, Liuna v. Molfetta Indus. Co., Inc.,* 365 F. App'x 347, 350 (3d Cir. 2010). Neal contends that the arbitrator issued an order stating that he would not be allowed to present any evidence at the hearing. That contention, however, is not supported by the record. The arbitrator's pre-hearing order (Order #18) explicitly permitted Neal (and Coyne) to cross-examine Asta's witnesses and, crucially, "to submit proof, in accordance with AAA rules, in opposition to any ASTA Evidence." (Asta Ex. 30 ¶ 7) In fact, at the hearing, the arbitrator explained to Neal that, should he wish to use any documentary evidence, the arbitrator would consider such requests. (Asta Ex. 35 Tr. 11:4-25) The arbitrator then instructed Neal to "please be ready to present whatever you think you need to for the purpose of these proceedings." (*Id.* 12:10-11) Accordingly, I find Neal's contention that the arbitrator erred by refusing to permit Neal to present evidence to be without merit. I decline to vacate the award on this ground.

Third, Neal has moved to vacate the award on the grounds that the arbitrator exceeded his authority by issuing pre-hearing subpoenas and by awarding injunctive relief and damages. It is axiomatic that an arbitrator's powers are confined by the contract. *County College of Morris Staff Ass'n v. County College of Morris*, 495 A.2d 865, 869 (N.J. 1985) ("The scope of an arbitrator's authority depends on the terms of the contract between the parties."). An arbitrator exceeds the authority granted by the contract when he or she disregards its terms or rewrites the contract. *See id.*

The FAA provides that arbitrators "may summon in writing any person to attend before them or any of them as a witness and in a proper case to bring with him or them any book, record, document or paper which may be deemed material as evidence in the case." 9 U.S.C. § 7. This provision has been construed by the Third Circuit as limiting the subpoena power of the arbitrator

to instances where "the non-party has been called to appear in the physical presence of the arbitrator and to hand over the documents at that time." *Hay Grp., Inc. v. E.B.S. Acquisition Corp.*, 360 F.3d 404, 407 (3d Cir. 2004). Thus, an arbitrator cannot order document production as such, but the arbitrator can compel a third party to appear before the arbitrator and to produce documents at that time simultaneously with that appearance. Here, the subpoena to Bank of America required the bank "to appear" on July 9, 2013, and "to testify and produce the documents set forth." (Asta Ex. 19) I find there is nothing to suggest that the Arbitrator acted outside of his powers in issuing the subpoena.

With respect to the injunctive relief and damages awarded, there is nothing to suggest that the arbitrator exceeded his authority in issuing the awards. The arbitrator took pains to detail in the Final Award which categories of damages were appropriate under the ITS Agreement for which cause of action. I find that the arbitrator appropriately relied on and construed the ITS Agreement in determining the damages awards. I do not find that the arbitrator's analysis rewrote the terms of the contract or otherwise disregarded its terms. Furthermore, the AAA Commercial Arbitration Rules permit an arbitrator to take "whatever interim measures he or she deems necessary, including injunctive relief." (AAA Rules R-34) Accordingly, I decline to vacate the award on this ground.[6]

### E.    Other Pending Motions

Having confirmed the arbitration award, granted summary judgment in favor of Asta in the Declaratory Judgment Action, and rejected all grounds to vacate the award, I may briefly dispose of other pending motions.

---

[6]    Coyne also argues that the award violates public policy. The only allegation in support of this contention, however, is that the award "makes a mockery of the Federal Arbitration Act, the Due Process protections of the Constitution, Supreme Court case precedent, and 200+ years of contract law." (Compl. ¶ 51) It appears that this argument relates to the arbitrator having determined his own jurisdiction, already discussed above.

In the actions to vacate the award, Asta's motions to dismiss are granted and the actions are dismissed with prejudice.

That leaves the following pending motions in the Declaratory Judgment Action: (1) Asta's motion to dismiss the complaint pursuant to Fed. R. Civ. P. 37; (2) Neal's appeal of Magistrate Judge Hammer's Order regarding the Bank Subpoenas; and (3) Neal and Coyne's motion to strike Asta's exhibits and certifications filed in support of its summary judgment motion. In light of the decision today on the summary judgment motions, the motion to dismiss for failure to provide discovery and the appeal of Magistrate Judge Hammer's Order are denied as moot. Neal and Coyne's motion to strike asserts the same arguments set forth in their summary judgment papers, couched as an argument that it is not necessary to look at certain documents because it is so clear that a non-signatory may not be bound to the arbitration. I disagree with that contention, as explained in detail above, and I deny the motion to strike.

## V.    CONCLUSION

For the reasons stated above,

(i) Asta's motion to confirm the Arbitration Award (Civ. No. 14-2495 Dkt. No. 3) is GRANTED. The Arbitration Award is confirmed. The motions to dismiss the Confirmation Action (Dkt. Nos. 7, 9) are DENIED.

(ii) Summary judgment in the Declaratory Judgment Action (Civ. No. 13-6981) is granted in favor of Asta (Dkt. No. 117) and denied as to Neal and Coyne (Dkt. Nos. 85, 158). Neal and Coyne are individually bound by the arbitration clause in the ITS Agreement. The remaining motions (Dkt. Nos. 94, 104, 154) are DENIED as moot.

(iii) Asta's motion to dismiss Neal's petition to vacate the Arbitration Award (Civ. No. 14-3550 Dkt. No. 7) is GRANTED. That action is DISMISSED WITH PREJUDICE.

(iv) Asta's motion to dismiss or consolidate Coyne's petition to vacate the
Arbitration Award (Civ. No. 14-3932 Dkt. No. 22) is GRANTED.
Coyne's petition to vacate is DISMISSED WITH PREJUDICE.

An appropriate order follows.

Dated:  June 30, 2016

HON. KEVIN MCNULTY, U.S.D.J.